http://www.va.gov/vetapp16/Files4/1630488.txt

Citation Nr: 1630488 
Decision Date: 07/29/16 Archive Date: 08/04/16

DOCKET NO. 13-33 697A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Reno, Nevada

THE ISSUES

1. Entitlement to service connection for low back disability.

2. Entitlement to service connection for bilateral hearing loss.

3. Entitlement to service connection for tinnitus.

4. Entitlement to service connection for a skin disorder, to include as due to exposure to Agent Orange.

5. Entitlement to service connection for acute myositis of the quadriceps.

6. Entitlement to service connection for peripheral neuropathy of the left lower extremity, to include as secondary to service-connected diabetes mellitus type II.

7. Entitlement to service connection for peripheral neuropathy of the right lower extremity, to include as secondary to service-connected diabetes mellitus type II.

8. Entitlement to service connection for peripheral neuropathy of the left upper extremity, to include as secondary to service-connected diabetes mellitus type II.

9. Entitlement to service connection for peripheral neuropathy of the right upper extremity, to include as secondary to service-connected diabetes mellitus type II.

10. Entitlement to service connection for a heart disorder to include ischemic heart disease, claimed as due to exposure to Agent Orange.

11. Entitlement to service connection for hemorrhage of blood vessels in the brain.

12. Entitlement to service connection for residuals of a cerebral vascular accident (CVA) or transient ischemic attack (TIA) due to peripheral vascular disease.

13. Entitlement to service connection for a bilateral eye disorder, to include as secondary to service-connected diabetes mellitus type II.

14. Entitlement to service connection for residuals of a right eye injury to include loss of vision.

15. Entitlement to service connection for disability as the result of exposure to certain chemical warfare agents and other substances as part of the soldier-volunteer test program of the Army Chemical Center (Edgewood Arsenal).

REPRESENTATION

Appellant represented by: Sean Kendall, Attorney

ATTORNEY FOR THE BOARD

D. Bredehorst, Counsel

INTRODUCTION

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2015). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The Veteran served on active duty from July 1964 to July 1966, and from October 1966 to March 1973.

This appeal to the Board of Veterans' Appeals (Board) is from a February 2011 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO).

In May 2014, the Veteran testified during a Travel Board hearing before a Veterans Law Judge (VLJ); a transcript of this hearing is of record. Since the VLJ who held the hearing is no longer employed at the Board, the Veteran was notified by way of a May 2016 letter of this and he was offered the opportunity to have a hearing with a different VLJ. He declined the offer that same month. See Correspondence received May 2016.

A substantial amount of printed materials from various sources regarding the Edgewood Arsenal experiments, unclassified documents, chemical and biological warfare agents, Project Dork, nerve agents, decontamination, and research and testing were received after the most recent supplemental statement of the case. A waiver of AO consideration was not included with this material. However, after reviewing this as well as the other evidence, the Board finds it is not relevant to the issues on appeal. It does not address elements needed to establish service connection and is cumulative in the respect that the record already establishes that the Veteran was an Edgewood Arsenal volunteer. Thus, there is no prejudice in deciding the appeal. 38 C.F.R. § 19.31.

The issues of service connection for a skin disorder, acute myositis of the quadriceps, bilateral upper and lower peripheral neuropathy, heart disorder, hemorrhage of blood vessels in the brain, CVA/TIA, bilateral hearing loss, tinnitus, and residuals of a right eye injury are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. The Veteran's low back arthritis did not originate in service or within one year of service, and low back disability is not otherwise etiologically related to service.
 
2. The Veteran does not have bilateral eye disability that is etiologically related to service, or which was caused or aggravated by service-connected disability.

3. The Veteran did not participate in human experiments in service that exposed him to certain chemical warfare agents and other substances that resulted in disability.

CONCLUSIONS OF LAW

1. Low back disability was not incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1112, 1113, 5017 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309 (2015).

2. Bilateral eye disability was not incurred in or aggravated by service nor is it secondary to service-connected disability. 38 U.S.C.A. §§ 1110, 5017 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2015).

3. A disability was not incurred in or aggravated by exposure to certain chemical warfare agents and other substances as part of the soldier-volunteer test program of the Army Chemical Center (Edgewood Arsenal). 38 U.S.C.A. §§ 1110, 5017 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board must assess the credibility and weight of all evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Equal weight is not accorded to each piece of evidence contained in the record; every item of evidence does not have the same probative value. When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the appellant prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

I. Duties to Notify and Assist

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his or her representative, if any, of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b) (2015). Notice must also contain information regarding assigned ratings and effective dates. See Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The duty to notify has been met. See VCAA/DTA Letters received December 10, 2010 and December 2, 2014, and Travel Board Hearing transcript. Neither the Veteran, nor his attorney, has alleged prejudice with regard to notice. The Federal Court of Appeals has held that "absent extraordinary circumstances...it is appropriate for the Board and the Veterans Court to address only those procedural arguments specifically raised by the veteran...." See Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). In light of the foregoing, nothing more is required. 

VA also has a duty to assist the Veteran by making all reasonable efforts to help a claimant obtain evidence necessary to substantiate a claim. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159(c) (2015). Available service treatment records have been obtained. VA treatment records and all other post-service treatment records adequately identified by the Veteran were obtained. 

The duty to assist includes, when appropriate, the duty to conduct a thorough and contemporaneous examination of the Veteran. The Veteran underwent a VA examination in December 2009 and May 2015 for his low back and bilateral eye disorder that contains sufficient information to address the medical questions at issue in this decision, and is considered adequate for decisional purposes, when considered together and with the other evidence of record. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007).

Hence, all necessary notification and development has been accomplished, and no further notice or assistance is required to fulfill VA's obligations concerning the development of the claims decided herein. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002).

II. Legal Criteria

Under the relevant laws and regulations, service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1110 (West 2014). Generally, the evidence must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1166 -67 (Fed. Cir. 2004); Caluza v. Brown, 7 Vet. App. 498, 505 (1995).

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third Shedden/Caluza element is through a demonstration of continuity of symptomatology if the disability claimed qualifies as a chronic disease listed in 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). No such disease or disability has been diagnosed or identified. As a result, service connection via the demonstration of continuity of symptomatology is not applicable in the present case.

Regulations also provide that service connection may be granted for a disability diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disability is due to disease or injury which was incurred in or aggravated by service. 38 C.F.R. § 3.303(d) (2015).

The Board must assess the credibility and weight of all the evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997), cert. denied, 523 U.S. 1046 (1998); Daye v. Nicholson, 20 Vet. App. 512 (2006). Under the benefit-of-the-doubt rule embodied in 38 U.S.C.A. § 5107(b), in order for a claimant to prevail, there need not be a preponderance of the evidence in the veteran's favor, but only an approximate balance of the positive and negative evidence. In other words, the preponderance of the evidence must be against the claim for the benefit to be denied. Gilbert v. Derwinski, 1 Vet. App. 49, 54 (1994).

III. Analysis

Disability Resulting From Volunteer Testing Conducted at Edgewood Arsenal

The Veteran alleges he has disabilities, to include distorted vision, as the result of his participation of volunteer testing at Edgewood Arsenal. He claims he was a "guinea pig" for the CIA with LSD testing for three weeks while in the Military. He had distorted vision associated with the testing. The Veteran reported that he was initially offered a test that involved putting something in his head to monitor his brain and when he refused that test he was give a different test the next day in which he ingested a substance on a sugar cube that he believes was LSD. He reported seeing animals coming out of the walls after the test, being unable to sleep for 24 hours following the test, and taking the test a total of 3 times. See VA examination received December 11, 2009, VA 21-4138 received March 15, 2010 and December 21, 2010, and page 305 of CAPRI records received September 23, 2014.

His service personnel records were carefully reviewed and confirm that he volunteered for testing at Edgewood Arsenal and that he was placed on TDY in April 1966 to participate in such testing. He underwent a physical examination on April 13, 1966 that included blood and urinalysis testing as well as psychological evaluation over the next several of days. However, these records also show that the Veteran refused to participate in the testing and that as a result he was released from the Human Volunteer Program that same month. The records specifically show that he reported to Edgewood Arsenal on April 13, 1966 and was released on April 27, 1966. See Military Personnel Records received August 10, 2010 and October 3, 2014, and Medical Treatment Record - Government Facility received December 22, 2010.

As further evidence the Veteran did not remain at Edgewood Arsenal, his service treatment records show he was seen at Walson Army Hospital on April 29, 1966. See page 17 of STR - Medical received August 6, 2015.

Although the Veteran is competent to report what he experienced, in this case exposure to warfare agents and substances during participation in human medical experiments, the Board finds that it is unlikely that he actually participated in testing and was given LSD, therefore, his statements are not credible. In reaching this conclusion the Board notes that his examination at Edgewood Arsenal stated he had a history of acute situational maladjustment and that he showed some inappropriateness of responses; the clinician recommended that he not be given psychochemicals. See page 44 of Medical Treatment Record received December 22, 2010. In short, his statements are contradicted by service personnel and treatment records that show he was released from the program for refusal to participate in testing. See Baldwin v. West, 13 Vet. App. 1 (1999); Wensch v. Principi, 15 Vet. App. 362, 367 (2001); Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007); Barr v. Nicholson, 21 Vet. App. 303 (2007). His service treatment and personnel records are competent , credible, and probative evidence and more reliable than the Veteran's assertions he was tested with LSD, which he made decades later. See Curry v. Brown, 7 Vet. App. 59, 68 (1994) (contemporaneous evidence has greater probative value than history as reported by the claimant).

As a preponderance of the evidence is against finding the Veteran was exposed to chemical warfare agents and other substances while in the military as part of a human medical testing, his claim for service connection for disability as a result of the exposure must be denied. Gilbert v. Derwinski, 1 Vet. App. 49, 54 (1994).

Low Back Disorder 

The Veteran reported that when he was in Vietnam in 1968 he was pushed off the back of a truck that was going 40 miles per hour. See Statement in Support of Claim received December 22, 2010. During the May 2015 VA examination he reported that immediately after the injury he began to have acute low back pain that improved, but also gradually worsened over the years. See page 34 of C&P Exam received June 3 2015. 

The 1968 injury that the Veteran contends occurred in Vietnam is not documented in his service treatment records, however, they do show that prior to this, in January 1967, he reported having a 1 year history of an intermittent backache. At the time he reported the pain was severe and the impression was backache. See page 27 of STR - Medical received August 6, 2015.

The Veteran has a current diagnosis that includes arthritis of the lumbar spine, but service connection for this disability on a presumptive basis may not be granted. In the absence of rebuttable evidence, service connection for certain chronic diseases, such as arthritis, will be presumed if manifest to a compensable degree within one year after separation from active service. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309.

The evidence does not establish a diagnosis of arthritis within the first year following his separation from service. The earliest X-rays were of the thoracic spine taken 3 years after service and they were normal. See page 3 of Medical Treatment Record - Non-Government Facility received May 4, 1978. Arthritis in the lumbar spine is not shown until February 1992, which is more than 1 year after service. See page 1 of Medical Treatment Record - Non-Government received August 21, 1992.

For chronic diseases such as arthritis, an alternative method of establishing the second and third Shedden/Caluza element is through a demonstration of continuity of symptomatology. See 38 C.F.R. § 3.303(b); Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).

Although he had intermittent symptoms for a year in 1967, a continuity of symptoms during the latter part of service or directly after service is not shown. In August 1976, 3 years after service, the Veteran had a work related injury that produced pain in the thoracic spine. Two months later he was readmitted to the hospital due to lower back pain with radiation to both lower extremities. See pages 3 and 7 of Medical Treatment Record - Non-Government Facility received May 4, 1978. The details of the injury and the resultant symptoms indicate that he had pain down the right side of his back to the right buttock and posterior hip ever since his injury, which appeared to be a flexion rotation mechanism injury with rotation to the left and flexion of the lumbar spine. See page 13 of Medical Treatment Record - Non-Government Facility received May 4, 1978. 

Also of record are associated insurance medical reports that state he no physical impairment due to a previous accident or disease and that and that the accident was the only cause of the Veteran's condition. See pages 34 and 36 of Medical Treatment Record - Non-Government Facility received May 4, 1978. 

In February 1992, the Veteran gave a history of another work-related back injury that occurred in January 1990 and he again denied ever having had any previous back problems. He previously had extensive studies including MRI, CT and standard X-rays and was found to have a lumbar disc herniation at the L3-4 level. He also had multiple bulging discs and markedly degenerated disc at the lumbosacral level. See page 1 of Medical Treatment Record - Non-Government Facility. 

As a layperson, the Veteran is competent to describe symptoms during and since service. See Layno v. Brown, 6 Vet. App. 465, 469-71 (1994) (lay testimony is competent as to symptoms of an injury or illness, which are within the realm of one's personal knowledge, personal knowledge is that which comes to the witness through the use of the senses). In weighing credibility, VA may consider many factors such as interest, bias, inconsistent statements, bad character, internal inconsistency, facial plausibility, self-interest, consistency with other evidence of record, malingering, desire for monetary gain, and demeanor of the witness. Caluza v. Brown, 7 Vet. App. 498 (1995); Macarubbo v. Gober, 10 Vet. App. 388 (1997); Coburn v. Nicholson, 19 Vet. App. 427, 432 (2006) (Board may reject such statements of the veteran if rebutted by the overall weight of the evidence).

In light of the evidence, the Veteran's statements regarding continuity of symptomatology are not credible due to the fact that they are inconsistent with earlier medical histories he provided after having post-service back injuries. Due to the contemporary nature of these earlier reports, they are regarded as more accurate and credible. The Board finds that information provided to a healthcare provider for treatment or diagnostic purposes is reliable as the declarant is motivated to provide accurate information. Therefore, while competent, the reports of continuity of symptomatology are not credible in light of the other evidence of record. See Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997) (finding Board entitled to discount the credibility of evidence in light of its own inherent characteristics and its relationship to other items of evidence).

There is also no probative evidence that links any of the Veteran's current low back disorders is related to his military service. On May 2015 VA examination the examiner essentially opined that the Veteran does not have a back disorder due to any event during service. The Veteran reported having continuous and consistent symptoms since his reported in-service injury, but a review of the records has not identified corroborating records. There are multiple records noting back pain in 1991, but the chronicity of events to support his claim has not been satisfied. See page 50 of C&P Exam received June 3, 2015.

The examiner's opinion is consistent with the record and it is probative. It was based on a review of the record and an examination, and the opinion was adequately supported by a rationale. In short, the evidence shows there is a lack of consistent or persistent symptoms since service. The Veteran is not found to have offered credible lay evidence of continuing symptoms, therefore, not relying on his statements does not diminish the probative value of the opinion. Post-service complaints and findings of back problems that include radiculopathy revolve around specific post-service work related injuries. There is no probative evidence that suggests any of his current disorders are related to any event during service. 

In light of the foregoing, a preponderance of the evidence is against finding that the Veteran has a low back disorder related to his military service. Under the circumstance, the evidence is not in equipoise and he is not afforded the benefit-of-the-doubt. Service connection is therefore denied.

Bilateral Eye Disorder

The Veteran contends he has a bilateral eye disability secondary to his diabetes mellitus. See Notice of Disagreement received February 13, 2012. He also associated his distorted vision with the LSD experiments that he volunteered for in service. See VA Examination received December 11, 2009. As previously discussed, however, the Board found that the Veteran's assertions regarding being tested with LSD were not credible, so this theory of entitlement is not a viable claim.

A February 1964 pre-induction examination revealed corrected distance vision was 20/200 in the right eye and uncorrected/corrected vision was 20/20 in the left eye. Near vision was 20/400 in the right eye and 20/20 in the left eye. See pages 7 of STR - Medical received October 3, 2014.

In July 1965, he was seen at the ophthalmology clinic and was noted to have right estropia. See page 37 of STR - Medical received August 6, 2015. A May 1966 separation examination revealed uncorrected distance vision was 20/20 bilaterally, and uncorrected near vision was 20/70 bilaterally. See pages 4 and 5 of STR - Medical received October 3, 2014.

In November 1967, he complained of having blurred vision at times. The opinion was that he was a malingerer. See page 54 of STR - Medical received August 6, 2015.

Service treatment records include an October 1966 enlistment examination that shows his uncorrected distance bilaterally was 20/20 bilateral, near uncorrected (J1). See page 3 of STR - Medical received October 3, 2014.

Post-service records show that he had a work-related injury in October 1976 and that since that time he had multiple complaints that included fuzziness of vision. See page 13 of Medical Treatment Record - Non-Government Facility received May 4, 1978. The following month, he complained of having difficulty focusing one eye with distance and near vision for 2 weeks. There was no previous ocular history. It was noted that he had a military physical and had passed. Right eye vision was 20/400 and left eye vision was 20/20 left. The impression included probable amblyopia, right eye. See page 20 of Medical Treatment Record - Non-Government Facility received May 4, 1978. 

A January 1978 eye evaluation by Dr. G. H indicates the Veteran reported having head trauma in August 1976 with temporal occipital involvement. Since the time of the trauma, he described having several symptoms that included blurred vision. He described intermittent blurred vision and an inability to focus. The examination showed the Veteran's visual acuity was 20/20 without correction for the left eye and 20/800 for right eye. The physician doubted the validity of this last visual acuity in that the Veteran could pick up one millimeter white objects at 20 inches using only the right eye. See pages 55 and 59 of Medical Treatment Record - Non-Government Facility received May 4, 1978. 

On December 2009 VA examination, the clinician indicated the Veteran reported he had been a limousine driver in the past and that he had been unable to pass a driver's license test due to vision problems. He has impaired vision in both eyes, and the physician suspected there may have been cataracts. See VA Examination received December 11, 2009.

A June 2010 VA treatment record contains an assessment of bilateral dry eye syndrome, reduced visual acuities, mild cataracts, and diabetes mellitus without retinopathy. See page 176 of CAPRI records received September 23, 2014.

A July 2014 diabetic retinal screening eye exam showed bilateral cataracts that were not visually significant but mildly contributing to vision loss bilaterally. He had a history of constricted visual fields bilaterally. The assessment was diabetes mellitus without retinopathy bilaterally, bilateral cataracts, history of constricted visual fields of the right eye according to a March 2010 note, posterior vitreous detachment bilaterally, corneal scarring bilaterally, constant exotropia of the right eye likely strabismus amblyopia contributing to reduced vision , and bilateral refractive error/presbyopia. See pages 10 to 13of CAPRI records received September 23, 2014.

The Veteran was afforded a VA examination in May 2015 to determine the likely etiology of his claimed bilateral eye disorder. The diagnoses noted in the record included bilateral cataracts. There was no evidence of diabetic retinopathy.

The examiner opined that the claimed eye disability was less likely than not secondary to a service-connected disability. The reason given was that the Veteran's bilateral cataracts were diagnosed 2010. A meta-analysis of major relevant studies related to the effect of diabetes on the risk of cataract ("Meta-analysis of the risk of cataract in type 2 diabetes") found an increased rate and risk of cataracts, especially posterior subcapsular cataract and cortical cataract, in patients with diabetes. While this analysis showed that type 2 diabetes caused an increased risk of cataract, this does not necessarily mean that all cataracts in diabetic patients are caused by diabetes, as cataracts are part of the normal aging process of the eye. Several factors must be considered when making this determination. 

After considering the Veteran's age, type and severity of cataracts, corrected visual acuity, and duration of cataracts and diabetes, the clinician found it to be less likely than not (less than 50 percent probability) that his cataracts are caused by, proximately due to, aggravated by, or the result of his diabetes mellitus. He also found the cataracts were less likely than not incurred in service or within one year discharge from service. The Veteran's cataracts are very likely age related cataracts. The severity and type of his cataracts are age appropriate, meaning they are typical of a man his age regardless of diabetes or military service. See C&P Exam received May 20, 2015.

The Board finds the medical opinion highly probative since it was based on the evidence and examination, and was supported by a well-reasoned rationale. Notably, there is no probative medical evidence that is contrary to the findings of the examiner. 

Regarding refractive error/presbyopia, which was noted in treatment records, for purposes of entitlement to benefits, the law provides that refractive error of the eyes is a developmental defect and not a disease or injury within the meaning of applicable legislation. In the absence of superimposed disease or injury, service connection is not granted for refractive error of the eyes, as this is not a disease or injury within the meaning of applicable legislation relating to service connection. 38 C.F.R. §§ 3.303(c), 4.9. 

The Veteran is not shown to have superimposed eye disease or injury in service. Furthermore, his bilateral dry eye syndrome was not shown in service or until many years after service, and there is no probative evidence that links it to service.

Upon consideration of the evidence of record, the preponderance of the evidence is against a finding that the Veteran has a bilateral eye disability, to include bilateral cataracts, that is related to service or secondary to his service-connected diabetes mellitus. Accordingly, the claim is denied.

ORDER

Service connection for disability as the result of exposure to certain chemical warfare agents and other substances as part of the soldier-volunteer test program of the Army Chemical Center (Edgewood Arsenal) is denied.

Service connection for low back disability is denied.

Service connection for bilateral eye disability is denied.

REMAND

Myositis of Quadriceps

On VA examination, the clinician stated there was no evidence to support a diagnosis of myositis; however, the physician also stated that the diagnosis was usually confirmed with serum alkaline phosphate testing, which is not available. See page 99 of C&P Exam. He did not explain why it was not available. Thus, it is unclear from his statement whether the proper testing was not available at that time, whether it is not available at that facility at all, or whether it was even possible to make the testing available. The matter therefore must be remanded for a supplemental opinion.

Ischemic Heart Disease

The Veteran underwent a VA examination in May 2015 that found no evidence of ischemic heart disease, but the clinician did note that chest x-rays were abnormal and showed tortuosity of the aorta that suggested hypertension. Given that the Veteran's hypertension is a service-connected disability, an opinion is needed to determine if the findings represent a disability of a heart disorder secondary to his hypertension. The record also shows that the Veteran had complaints of palpitations and racing heart in service and after service. No opinion has been offered yet to determine of these symptoms are associated with a current cardiac disorder and are related to service.

Skin Disorder

On May 2015 VA examination, the clinician indicted the Veteran had psoriasis and acne, but not chloracne. Chloracne is a skin disorder that is presumed to be related to exposure to certain herbicide agents in Vietnam. See 38 C.F.R. §§ 3.307, 3.309(e). Regulations do not limit the presumption of service connection to chloracne, but also extend it to other acneform diseases consistent with chloracne. Since the Veteran was diagnosed with acne, clarification is needed to determine if it falls within the category of other acneform diseases consistent with chloracne. 

Brain Bleed

Records show that in March 2006, the Veteran was diagnosed with a non-traumatic subdural hematoma based on findings of a CT scan of the brain. See Medical Treatment Record - Non-Government Facility received May 7, 2010.

On May 2015 VA examination, the clinician stated there was no evidence of a central nervous condition, but noted that hypertension would be initially considered for any brain hemorrhage and is the most common cause of intracerebral hemorrhage. He also noted that diabetes mellitus damages small vessels. See C&P Exam received June 3, 2015. It is unclear if the non-traumatic subdural hematoma is a hemorrhage or if it involves the type of small vessel damage caused by diabetes, and the Board is not qualified to make such determinations. Furthermore, since the examiner did not specifically address the subdural hematoma, another opinion is needed.

Given that the Veteran's claim for a CVA/TIA arguably involves the same evidence, the Board will remand this claim as well.

Bilateral Upper and Lower Extremity Peripheral Neuropathy

On May 2015 VA examination, the examiner essentially opined that the Veteran's bilateral upper and lower extremity neuropathy was related to his cervical and lumbar spine degenerative disc disease. See page 26 of C&P Exam received June 3, 2015. The opinion's rationale does not address whether the neuropathy was aggravated by the Veteran's diabetes mellitus or PTSD, so it is incomplete and not adequately compliant with the August 2014 remand directives. Consequently, a supplemental opinion is needed.

Residuals of a Right Eye Injury

The May 2015 VA eye examination that was conducted in response to the Board's May 2014 is inaccurate, therefore, it is inadequate to decide the claim.. The examiner diagnosed right eye strabismus amblyopia and corneal scarring. The examiner opined that these were less likely than not related to service. The rationale give for the Veteran's corneal scarring was that the scarring was not documented until 2010. See C&P Exam received May 20, 2014.

Contrary to the examiner's statement, a November 1976 post-service record contains an eye examination that shows the Veteran had a small corneal scar on the right eye. See page 20 of Medical Treatment Record - Non-Government Facility received May 4, 1978. Furthermore, an April 1966 clinical examination during service shows there was a slight haze on the right cornea. See page 4 of STR - Medical received August 6, 2015. Notably, the May 2015 VA examiner diagnosed right eye corneal haze/scar. 

The VA examiner also stated that the Veteran's strabismus amblyopia was the cause of his vision loss; however a July 2014 treatment record indicates the corneal scarring also contributed. See page 10 of CAPRI records received September 23, 2014.

Due to the inconsistency and inaccuracy, the Board finds that another eye examination is needed.

Hearing Loss and Tinnitus

On May 2015 VA examination, the examiner indicated that the Veteran currently had a hearing loss disability, for VA purposes, but found it was less likely than not caused by or the result of service. The rational provided is inadequate to decide the claim because it was based on the premise that the Veteran's hearing was within normal limits throughout his service.

When the findings of his February 1964 pre-induction audiogram examination are converted from ASA to ISO, the results indicate some areas of hearing loss. In particular, on the authorized audiological evaluation, pure tone thresholds, in decibels, were as follows:

HERTZ

500
1000
2000
3000
4000
RIGHT
30
25
25
NT
20
LEFT

Based on how these findings were reported, they appear to relate to both ears since only one set of findings were reported and it was filled in the space between the left and right ears on the chart. See page 7 of STR - Medical received October 3, 2014. 

The separation examination in May 1966 did not include an audiological examination. Instead, only a whispered voice test was given with finding of 15/15. See page 5 of STR - Medical received October 3, 2014. 

On the authorized audiological evaluation in October 1966 for his enlistment into his second period of service, pure tone thresholds, in decibels, were as follows:

HERTZ

500
1000
2000
3000
4000
RIGHT
40
25
15
15
25
LEFT
30
25
15
15
20

See page 3 of STR - Medical received October 3, 2014.

Generally, the threshold for normal hearing is 0 to 20 decibels. Hensley v. Brown, 5 Vet. App. 155 (1993). Since the pre-induction examination in February 1964 contained hearing thresholds above 20 decibels at 3 levels his hearing is not shown to be within normal limits, which raises the question of whether the Veteran had a pre-existing hearing loss. Even though these findings do not meet the criteria for a hearing loss disability the also reflect some level of hearing loss. For VA purposes, hearing impairment is considered a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz (Hz) is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385.

In light of this evidence, the Board finds another VA examination is needed to determine whether the Veteran's current bilateral hearing loss is related to service and whether he had a preexisting hearing loss that was aggravated by service or had hearing loss that began in service. As tinnitus may be secondary to the Veteran's hearing loss, these two issues are inextricably intertwined. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (two issues are "inextricably intertwined" when they are so closely tied together that a final Board decision cannot be rendered unless both are adjudicated).

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. The Veteran should be asked to identify all sources, both VA and private, of his treatment for the claimed disabilities. After obtaining the appropriate releases for any private providers identified, the RO/AOJ should attempt to obtain copies of such records not already associated with the Veteran's claims file for inclusion in the evidence.

2. Make the Veteran's electronic file available to the physician who performed the May 2015 VA examination for a supplemental statement. The physician should address the following:

a) Explain why the serum alkaline phosphate testing used to diagnosis myositis was not available and if it was possible to make the testing available. If it is possible to make the testing available, then the Veteran should be scheduled for an examination in order have the appropriate testing performed. 

b) Opine whether the Veteran's bilateral upper or lower neuropathy was at least as likely as not aggravated by the service-connected diabetes or PTSD. An explanation of the rationale is needed.

c) Opine whether the Veteran's acne is at least as likely as not another acneform disease consistent with chloracne. If another examination is needed to render this opinion, then one should be scheduled.

d) Was the subdural hematoma diagnosed in March 2006 at least as likely as not caused or aggravated by the Veteran's service-connected diabetes mellitus?

e) Was the subdural hematoma diagnosed in March 2006 at least as likely as not caused or aggravated by the service-connected hypertension?

f) Does the Veteran have any residuals of a CVA and/or TIA, to include the subdural hematoma diagnosed in March 2006?

g) If the veteran has any residuals of a CVA and/or TIA, was the CVA/TIA and associated residuals at least as likely as not caused by or chronically worsened (i.e., aggravated) by service-connected disability?

An adequate explanation of the rationale used to support each opinion expressed is needed.

3. Arrange for a VA heart examination to determine the nature and likely etiology of the Veteran's claimed heart disorder. The electronic files (VBMS and Virtual VA) must be made available to and reviewed by the clinician; a notation to this effect must be in the report. All findings should be fully reported.

a) Based on the examination, the Veteran's reported histories, and review of his medical treatment records, respond to the following:

* Are the Veteran's complaints of palpitations and racing heart at least as likely as not related to a current heart disorder? If so, identify the disorder.

* Did any diagnosed heart disorder at least as likely as not (a 50 percent or greater probability) have its onset during service or is otherwise related to any event of service? 

* Does the Veteran have a current hear disorder that was caused or aggravated (meaning permanently worsened beyond natural progression) by his service-connected hypertension?

b) In rendering the opinions the examiner should comment on the May 2015 examination report that indicated that chest x-rays were abnormal and showed tortuosity of the aorta that suggested hypertension. 

An adequate explanation of the rationale is needed to support all opinions expressed.

4. Arrange for a VA eye examination to determine the nature and likely etiology of the Veteran's claimed right eye disorder. The electronic files (VBMS and Virtual VA) must be made available to and reviewed by the clinician; a notation to this effect must be in the report. All findings should be fully reported.

a) Based on the examination, the Veteran's reported histories, and review of his medical treatment records, respond to the following:

* Did any diagnosed right eye disorder, to include corneal scar and cataract, at least as likely as not (a 50 percent or greater probability) have its onset during service or is otherwise related to any event of service to include the Veteran's reported eye injury? The examiner is advised that the Veteran in competent to report having received an injury to the right eye even if the event is not documented in his treatment records.

b) In rendering the opinions the examiner should comment on the April 1966 examination report that shows the Veteran had a slight haze on the right eye, complaints of blurred vision in service, and a November 1976 post-service treatment record contains evidence of a right eye corneal scar. 

An adequate explanation of the rationale is needed to support all opinions expressed.

5. Arrange for a VA audiology examination to determine the nature and likely etiology of the Veteran's bilateral hearing loss and tinnitus. The electronic files (VBMS and Virtual VA) must be made available to and reviewed by the clinician; a notation to this effect must be in the report. All findings should be fully reported.

a) Is there clear and undebatable evidence that the Veteran had hearing loss in either ear that pre-existed his active duty service? . If so, identify the evidence. The examiner must specifically discuss the Veteran's February 1964 pre-induction examination from his first period of service and October 1966 enlistment examination from his second period of service, which the Board had converted above from ASA to ISO.

b) If it is determined that hearing loss clearly and undebatably preexisted service, is there is clear and undebatable evidence that the overall preexisting hearing loss was not aggravated beyond the natural progression of the condition?

c) If hearing loss in either ear did not preexist service, did it at least as likely as not have its onset during service or was otherwise related to service to include noise exposure?

d) Is the Veteran's tinnitus at least as likely as not caused by the Veteran's service to include noise exposure?

e) Is the Veteran's tinnitus at least as likely as not caused or aggravated by his hearing loss?

f) In rendering these opinions, the examiner must discuss the March 1972 separation examination that reflected a 0 decibel threshold at all levels tested and whether such findings are valid given the findings noted in February 1964 and October 1966.

The examiner must explain the rationale underlying all opinions.

6. After completing the requested action, and any additional notification and/or development deemed warranted, readjudicate the issues on appeal. If any benefit sought on appeal remains denied, the Veteran and his attorney should be provided a supplemental statement of the case (SSOC). The SSOC must contain notice of all relevant actions taken on the claim for benefits, to include a summary of the evidence and applicable law and regulations considered pertinent to the issue currently on appeal. An appropriate period of time should be allowed for response. Thereafter, the case should be returned to the Board, if in order.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
Thomas H. O'Shay
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs